[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is an action for a declaratory judgment to establish the date of death for purposes of determining coverage under a group term life CT Page 15157 insurance policy. The facts giving rise to this action are as follows:
Barry James Sheridan disappeared on the night of December 11, 1990, and upon information and belief, was never heard from again. After seven years had passed, his estate asserted the benefit of the statutory presumption of death. General Statutes § 45a-329. On April 30, 1998, the Probate Court for the District of Ellington, Rady, J., issued a decree presuming Mr. Sheridan's death for the purpose of settling his Estate. Judge Rady would not, however, determine the date of death. The decedent's beneficiary, Sandra L. Sheridan, has asserted a claim for benefits under a group life insurance policy (policy no. 0424937) issued by the plaintiff to the decendent's employer, Moran Towing Corporation. That policy expired on November 1, 1991. The policy requires the claimant to provide "due proof that [the issued] died while insured for this benefit." The plaintiff, Connecticut General Life Insurance Company, instituted this declaratory judgment action to ascertain the date of Mr. Sheridan's death for purposes of determining coverage under the policy.
The issue for the court is whether there is sufficient evidence to determine that Barry James Sheridan died during the term of the policy. The defendant submits three exhibits as evidence that the decedent died during the policy term. They are as follows:
1. An affidavit of his widow.
 2. A deposition of Officer Joseph Muldoon of the Missing Persons Squad of the New York City Police Department.
 3. Copies of the New York City Missing Persons Squad's reports on their investigation of the decedent.
This evidence is uncontroverted and is reasonably found to be as follows:
Decedent's beneficiary and widow, Sandra L. Sheridan (Sandra) were married in 1985. They had one daughter born of the marriage, Ashley, born December 11, 1985. Ashley's birthday is quite significant to this case.
Sandra had another daughter at the time of her marriage to the decedent. Her name is Jodie Cunningham. The decedent treated Jodie as his own daughter. He also had two other daughters from a previous marriage, Maureen and Patricia.
The decedent, who was an able-bodied seaman, received a bachelor's degree in Oceanographic Technology from the Florida Institute of Technology in 1994. He had worked as a seaman nearly continuously from CT Page 15158 1975 until his disappearance on December 11, 1990.
His employment required him to be at sea for several weeks at a time, followed by several weeks of share leave.
Sandra avers that the decedent never missed a ship's movement and prided himself on his reliability for work. Sandra reports that the decedent was a loving father and husband. He also maintained close contact with his two daughters from a previous marriage, already alluded to. He spoke to them weekly on the telephone and wrote them often. (These daughters of the decedent would spend one month each summer with the decedent and the defendant.)
The decedent always called to wish his daughters a happy birthday, even while out at sea. He also called home at least once a week.
On December 11, 1990 was the decedent's daughter Ashley's fifth birthday and he failed to call home to wish her a happy birthday.
The next day, December 12, 1990, the defendant was contacted by the decedent's employer as the decedent was not present for the departure of his vessel. The defendant was concerned for decedent's safety and welfare because he had never missed a work assignment or a child's birthday before.
The following day, December 13, 1990, the defendant along with the decedent's brother and two of his brother-in-laws went to Brooklyn to assist in the New York Police Department's investigation of the decedent's disappearance.
The family made massive efforts to locate the decedent. They contacted the local hospitals to determine if the decedent or anyone matching his description was either admitted or brought in DOA. They printed up missing person's fliers on the streets of New York. They asked the U.S. Coast Guard to conduct an investigation. They retained a private investigation to investigate the decedent's disappearance. They contacted a local and television channel and persuaded it to turn a story on decedent's disappearance. They hired Scott Radison of Linderworks, Inc. To perform an underwater search under several of the piers in the area where the decedent had disappeared. They arranged for a search of the East River using a "fish finder", a type of sophisticated scanner device. (This search took two days.) And, finally, they canvassed the area of Pier 6, where the decedent was stationed and left the fliers with area businesses.
All of these efforts were frivolous. After the Christmas Holidays the CT Page 15159 family returned to New York and spent three days meeting with New York City detectives and recanvassing the neighborhood with the missing person fliers.
Their investigation revealed that the decedent had in fact left his vessel on the evening of December 11, 1990 to call his family. (Ashley's birthday.) The call, of course, was never received but they did receive a birthday card sent by decedent and addressed to Ashley. It arrived a few days after his disappearance.
In addition to the foregoing investigation the New York City Policy Department Missing Persons Bureau conducted its investigation which included a search by a harbor located at the area around Pier 6 to see if the decedent's body had fallen in the water and had been caught up on the pilings beneath the pier. That search was negative. The police also used a cadaver sniffing dog in without success. They also scuba dove in the area with negative results. The police also checked every New York hospital, all New York morgues and the New York Criminal Justice System. Detective Joseph Muldoon did not find it likely based upon his experience that the decedent experienced a land based death. He based that conclusion, upon all of the myriad of ways that land based deaths are discovered. He believed the decedent's death was water based. He also did not find it odd that the body of a person drowned in New York harbor would not be found.
 Q. Is your opinion as to Mr. Sheridan's fate affected in any way by the fact that to date no body has yet been recovered from the water matching Mr. Sheridan's description?
A. No.
Q. Why not?
 A. New York harbor empties out basically into the Atlantic Ocean. There have been people that go into the river, into the East River or in the Hudson River up by the George Washington Bridge, off the 59th Street Bridge, Brooklyn Bridge, anyone near the promenade, get found in Coney Island, over here in Red Bank.
Q. How many miles would that be?
 A. That could be 10, 15 miles — I believe it's 12 miles from the Verrazano to the George Washington Bridge.
CT Page 15160
 New York Harbor is over a mile wide at the Verrazano Narrows. Once you leave the Narrows, you're going straight out to sea. That's why the checks were done for New Jersey, just the New Jersey side, which even here, on this side, New York city harbor takes responsibility for. If he had gone out under the bridge and wound up down by Bayonne, that was always a possibility.
 He could have been floating right below the surface and either sucked up into a ship's intake or just pushed along — the fact that somebody goes into the water and is not found is not totally unremarkable, at least not to me.
 I grew up around the water. Some people have been down for extremely long periods of time and some people go down and just never come back.
(Muldoon Dep. at 58-59.)
After thoughtful consideration, the court finds that the weight of the evidence preponderates in favor of the defendant[1] and thus declares that the decedent expired on December 11, 1990, within the effective period of the subject life insurance policy.
GILL, J.